IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 1:17-cv-01359-LTB

MARY ANN R. MAY,

      Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

Plaintiff, Mary Ann R. May, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal.

After consideration of the parties' briefs, as well as the administrative record, I REVERSE and REMAND the Commissioner's final order for further proceedings.

## I.    STATEMENT OF THE CASE

Plaintiff is a 65 year-old woman who has worked mainly in the nonprofit sector. [Administrative Record ("AR") 123, 167] She seeks judicial review of SSA's decision denying her application for DIB. ECF No. 1. Plaintiff filed her application on October 29, 2014 alleging that her disability began on November 11, 2013. [AR

123, 125]

The application was initially denied on February 11, 2015. [AR 60–66] The

Administrative Law Judge ("ALJ") conducted an evidentiary hearing on October 12,

2016 and issued a written ruling on February 7, 2017. [AR 12–58] In that ruling,

the ALJ denied Plaintiff's application on the basis that she was not disabled

because, considering her age, education, and work experience, she had the residual

functional capacity to perform past relevant work. [AR 12–25]  The SSA Appeals

Council subsequently denied Plaintiff's administrative request for review of the

ALJ's determination, making SSA's denial final for the purpose of judicial review.

[AR 1–3]; *see* 20 C.F.R. §404.981. Plaintiff timely filed her Complaint with this

court seeking review of SSA's final decision.

## II.    LAW

### A. SSA's Five-Step Process for Determining Disability

A claimant is "disabled" under Title II of the Social Security Act if she is

unable to "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Bowen v. Yuckert*, 482 U.S. 137,

140 (1987). SSA has established a five-step sequential evaluation for determining

whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in

"substantial gainful activity." If she is, benefits are denied and the inquiry stops.

20 C.F.R. § 404.1520(b). At step two, SSA asks whether the claimant has a "severe

impairment"—that is, an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If she does not, benefits are denied and the inquiry stops. If she does, SSA moves on to step three, where it determines whether the claimant's impairments "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC")—that is, what she is still able to do despite her impairments—and asks whether the claimant can do any of her "past relevant work" given that RFC. 20 C.F.R. § 404.1520(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows her to do other work in the national economy in view of her age, education, and work experience. 20 C.F.R. § 404.1520(g).

In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).

### B. Standard of Review

My review concerns only whether SSA's factual findings are supported by substantial evidence and whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). Reversal may be appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance

on the correct legal standards. *Id.* I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hamlin v. Barnhart*, 365 F.3d at 1214. A conclusion "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I examine the record as a whole, but may not reweigh the evidence or substitute my judgment for that of the ALJ. *Hamlin v. Barnhart*, 365 F.3d at 1214.

### III.    THE ALJ'S RULING

In his ruling, the ALJ followed the five-step analysis outlined above. The ALJ concluded under the first step that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. [AR 17] Under step two, the ALJ determined that Plaintiff had the "following severe combination of impairments: status post breast cancer and diabetes mellitus." [*Id.*]

The ALJ concluded under step three that the enumerated severe impairments did not meet or medically equal an impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1. [AR 17–19] The ALJ found that Plaintiff had the RFC to perform

light work except that she is limited "with occasional posturals, except no crawling or climbing of ladders, ropes, or scaffolds; and no exposure to hazards such as unprotected heights and moving mechanical parts; also no concentrated exposure to extreme heat, extreme cold, wetness, humidity and vibration." [AR 19]

Under step four, the ALJ found that Plaintiff was able to perform her past relevant work of volunteer services coordinator, fundraiser, and grant coordinator. [AR 25] Thus, the ALJ concluded that Plaintiff is not disabled. [AR 25–26]

## IV.    ISSUES ON APPEAL

There is an initial issue concerning whether Plaintiff is limited to light work and whether she is unable to perform work on a regular and continuing basis. Additionally, in appealing the ALJ's decision, Plaintiff argues that the ALJ erred by: (1) not giving proper weight to the opinions of Gordon Ehlers, M.D., Marsha Evans, M.A., L.P.C., and Gayle Frommelt, Ph.D.; (2) failing to consider the effects of Plaintiff's mental health impairments when formulating her RFC; (3) improperly determining Plaintiff's credibility; and (4) failing to sufficiently justify his rejection of a statement from a third-party witness.

### A. The ALJ's analysis of Plaintiff's limitation to unskilled work or "Regular and Continuing Employment"

Plaintiff makes two general arguments: (1) that she is "limited to no more than sedentary or light, unskilled work, and is disabled pursuant to Medical Vocational Disability Rule 201.06 or 202.06 (20 C.F.R. §404, Subpart 1, Appendix 2);" and (2) "she is unable to perform work on a regular and continuing basis and is therefore disabled under the provisions of the Social Security Ruling 96-8p . . . ."

ECF No. 16 at 19.

Defendant argues that since the ALJ determined that Plaintiff could perform light work, "the only point of contention in this case is Plaintiff's argument that the ALJ should have, but did not include a limitation to unskilled work." Def.'s Resp., ECF No. 17 at 8–9. Defendant then shapes its argument under the guise of whether the ALJ was correct in not including a limitation to unskilled work in Plaintiff's RFC. *Id.* at 9–24.

In her Reply, Plaintiff contends that Defendant misinterprets her argument and that "she has argued that either a limitation to unskilled work, or a limitation to less than 'regular and continuing' employment requires a finding of disability in her case." Pl.'s Reply, ECF No. 20 at 3. Plaintiff continues that no competitive work would be available if certain hypotheticals presented to the VE were established to be present "regardless of skill level." *Id.* Plaintiff argues that the hypotheticals presented were indeed established by Dr. Ehlers' opinion, and as such, the ALJ did not reasonably explain why he rejected those opinions. *Id.* at 8–9; *see* ECF No. 16 at 21.

Additionally, Plaintiff clarifies that if the ALJ properly formulated the RFC with Dr. Ehlers' opinions, under SSR 96-8p Plaintiff could not work a regular and continuing work schedule and should be found disabled regardless of her ability to perform skilled work. *Id.* at 4.

I partially agree with Plaintiff concerning this distinction. The parties agree that part of what is at dispute is whether Plaintiff can perform only unskilled work.

ECF Nos. 17 at 8–9 and 20 at 4. That analysis is contained *infra*. Plaintiff also claims in her Opening Brief that "she is unable to perform work on a regular and continuing basis and is therefore disabled under the provisions of Social Security Ruling 96-8p . . . ." ECF No. 16 at 19.

SSR 96-8p is a clarification of SSA's policies regarding the assessment of a claimant's RFC. SSR 96-8p, 1996 WL 374184, at *1 (Jul. 2, 1996) ("SSR 96-8p"). SSR 96-8p reads that "[o]rdinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

Plaintiff appears to argue that if the ALJ accepted Dr. Ehlers' opinions regarding Plaintiff's need to: (1) be off-task for 25% or more of the day; or (2) take excessive breaks, it would necessarily mean that Plaintiff is disabled because she could not work a "full 'regular and continuing' work schedule." ECF No. 20 at 4.

I disagree that I must find Plaintiff disabled if it is determined that Dr. Ehlers' relevant opinions were improperly disregarded, but I do find that if such opinions were improperly disregarded, remand is warranted. *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (remanding in part because the ALJ erred by not considering an RFC for "work activity on a regular and continuing basis").

### B. The ALJ's weight given to, and evaluation of, certain medical opinions

Plaintiff argues that substantial evidence does not support the weight the ALJ gave to the opinions of Dr. Ehlers, Dr. Frommelt, and Ms. Evans. Pl.'s Br., ECF No. 16 at 20–25.

7

In formulating a claimant's RFC, "the ALJ must give consideration to all the medical opinions in the record." *Paulsen v. Colvin*, 665 F. App'x 660, 664 (10th Cir. 2016) (unpublished) (citing 20 C.F.R. § 404.1527(c)). However, an "ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Jimison ex rel. Sims v. Colvin*, 513 F. App'x 789, 794 (10th Cir. 2013) (unpublished) (quoting *Clifton v. Chater*, 79 F.3d at 1009–10).

### 1. Dr. Ehlers' Opinion

Plaintiff argues that the ALJ, in giving Dr. Ehlers' opinion "some weight," did not take Dr. Ehlers' suggested limitations into account. ECF No. 16 at 20. Plaintiff points to various notes and opinions from Dr. Ehlers and argues that these should have been included in Plaintiff's RFC, and if so included, would have prevented Plaintiff "from performing any competitive work in the national economy, per the vocational expert's testimony." *Id.* at 21. Plaintiff states that reversible error occurred because the ALJ did not provide specific and legitimate reasons for rejecting noted portions of Dr. Ehler's opinion. *Id.* Further, Plaintiff argues that it was incorrect for the ALJ to reject Dr. Ehler's opinion—along with Ms. Evan's, Plaintiff's, and a third-party witness' opinions—based upon Plaintiff's exercise regimen. *Id.* at 21–22. Plaintiff reasons that the act of her exercising does not undoubtedly mean she was not fatigued. *Id.*

"A treating-source opinion concerning the nature and severity of a

claimant's impairment is entitled to controlling weight provided it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Paulsen v. Colvin*, 665 F. App'x at 664 (quoting 20 C.F.R. § 404.1527(c)(2)) (alterations omitted). The weight the ALJ assigns to a treating physician "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (Jul. 2, 1996) ("SSR 96-2p").

If the ALJ declines to give a treating-source opinion controlling weight, he must then determine what weight to give the opinion using the factors in 20 C.F.R. § 404.1527(c)(2)(i), (c)(2)(ii), and (c)(3) through (c)(6). *Paulsen v. Colvin*, 665 F. App'x at 664. Under SSR 96-2p, all these factors must be weighed by the ALJ in determining the treating-source opinion's weight. SSR 96–2p, at *4. However, the ALJ need not explicitly discuss each factor. *Armijo v. Astrue*, 385 F. App'x 789, 795 (10th Cir. 2010) (unpublished); *see Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the [20 C.F.R. § 404.1527(c)] factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review."). "An ALJ cannot reject a treating source's opinion without identifying 'specific, legitimate reasons.'" *Schwarz v. Barnhart*, 70 F. App'x 512, 515 (10th Cir. 2003) (unpublished) (citing cases).

Plaintiff argues that the ALJ did not give specific and legitimate reasons in rejecting Dr. Ehlers' opinions that his findings concerning Plaintiff would cause her

"to be off task 25% or more of the workday, that she would need to have hourly breaks of 15 minutes each, and that she was incapable of even 'low stress' work." ECF No. 16 at 21.

It appears that the main reason the ALJ only gave "some weight" to Dr. Ehlers' opinion is that the ALJ found "that nothing in Dr. Ehlers' treatment notes identifie[d] that the claimant had significant limitations with sitting, standing, walking, lifting, or carrying, given her ability to engage in extensive physical fitness activities." [AR 23] Concerning those extensive physical activities, the ALJ highlighted "[w]hile the claimant reported some issues with fatigue, Dr. Ehlers also noted that the claimant work[ed] out three to four times per week and was swimming 40 laps in the pool and doing Zumba" and "[l]ater treatment notes also noted that the claimant exercise[ed] four days per week [including] swimming 1/2 mile, engaging in Zumba, and walking." [*Id.*] The ALJ additionally reasoned that Dr. Ehlers' opinion was inconsistent with his findings because he "noted that the claimant's mental impairment symptoms were not adequately controlled, yet his treatment notes specifically indicated that the claimant reported no complaints from depressed mood and was 'generally upbeat.'" [AR 23]

Dr. Ehlers' medical treatment notes span three years and occur every few months, in addition to phone conversations. [AR 436] In July and September 2013, Dr. Ehlers first noted fatigue and elevated blood pressure. [AR 374–78] In December 2013, Dr. Ehlers noted Plaintiff's diagnoses of breast cancer and diabetes mellitus, and also noted "somewhat less physical activity during the postop period

of time." [AR 371–72] Plaintiff returned a week later after the "sudden exacerbation of her type 2 [diabetes]." [AR 369]

Following meetings with a care manager concerning her diabetes, Dr. Elhers' wrote that Plaintiff was tired, but was beginning to feel normal with reasonable energy and began to swim again "for the first time in a couple of months." [AR 365–67] In March 2014, Dr. Elhers wrote that Plaintiff's energy level was improving and that she was exercising regularly, adding Zumba to her swimming sessions. [AR 361]

In June 2014, Plaintiff reported that she was exercising five times per week, although her stamina was not as good as she would have liked. [AR 359] Dr. Ehler encouraged Plaintiff to "keep up the excellent work" regarding diet, exercise, and blood sugar control. [AR 360] He asked Plaintiff to "[k]eep thinking about whether your lack of stamina is more physical or possibly related to the life changing events you have had to deal with." [*Id.*] In an August 2014 follow up regarding Plaintiff's diabetes, she noted she was feeling "pretty good," but there were issues with her blood sugar levels and blood pressure. [AR 353] A few months later, Plaintiff stated that she was not sleeping well because of a cough and was not doing particularly well due to the lack of sleep. [AR 349] She was in part assessed with fatigue at that time. [AR 350]

In December 2014, Dr. Elhers wrote that Plaintiff had more energy, was sleeping better, and was "[e]xercising regularly and tolerating it well." [AR 346] In March 2015, Dr. Ehlers noted that Plaintiff got tired more often and ran out of

energy at times, and associated being tired with fluctuating blood sugars. [AR 443]

Dr. Ehlers wrote that Plaintiff worked out three to four times per week, although

was swimming less than usual due to boredom. [AR 443] She was again assessed

with fatigue and did not think she had the energy to complete a full day of work as

she required frequent rest periods throughout the day. [AR 443–44]

In June 2015, Dr. Ehlers again noted blood sugar fluctuations and that

Plaintiff was "losing steam later in the day." [AR 440] He wrote that "fatigue and

lack of stamina [were] her major issues." [*Id.*] The same day, Dr. Ehlers completed a

medical source statement. [AR 436–39] Dr. Ehlers noted that Plaintiff would need

unscheduled breaks of 15 minutes every hour, caused by chronic fatigue and

"extreme fluctuations in blood sugar." [AR 437] He noted that in a competitive work

environment, Plaintiff could walk one-and-a-half city blocks without rest, could sit

for a maximum of an hour at a time and could stand for ten minutes at a time. [AR

436–37] Dr. Ehlers checked boxes indicating that in an eight-hour workday,

Plaintiff could sit for less than two hours total and stand or walk for less than two

hours total. [AR 437.] He additionally checked a box indicating that Plaintiff needed

a job that permitted shifting positions at will from sitting, standing, or walking.

[*Id.*] Dr. Ehlers checked boxes indicating that Plaintiff would likely need to be "off-

task" for 25% or more of the day and would be incapable of "even 'low stress' work"

because of blood sugar fluctuations exacerbated by stress. [AR 438–39]

A year later in June 2016, Plaintiff stated she felt "less unwell" and Dr.

Ehlers noted that she exercised and worked two afternoons per week and was trying

to "husband her energy." [AR 552] In August 2016, Dr. Ehlers noted Plaintiff was generally upbeat and feeling "pretty good." [AR 549]

In her oral hearing, which took place a few months after Dr. Ehlers last treatment note in the record, Plaintiff spoke to her exercise activity, explaining that in a typical day

> I get up and I will walk my dog around the block, she has to wait for me. And then a couple of times a week I'll exercise but I do exercise -- I used to swim four to five times a week but I don't have the stamina. But I'll do an exercise class because I can manage that, I don't have to go as intensely as the teacher. And then really the truth is I lay low, I lay on my bed and I read and watch TV unless I have a doctor's appointment and that's, really that's the truth, that's what I do.

[AR 45]

Concerning fatigue generally, Plaintiff noted that her neighbors help with her yard work and she hired someone for housework because she could not do it. [AR 46] She added she can only do one errand in a day. [Id.] She noted that she had to cease a part-time—four hours two days a week—caretaker job because the client wanted someone full time, but she was fatigued and could not do it. [AR 44]

She explained that she volunteered as a para-chaplain and visited an elderly client one time per week, which she could do because she would "just sit there and talk." [AR 45] However, she said that it was very hard for to do two tasks in a day because "her blood sugar [went] crazy." [Id.] She stated that she would "lay low a lot," meaning she would lay on her bed reading or watching TV and did not talk to anybody or answer the phone because it was too much energy for her. [AR 49] Plaintiff explained that she went on two trips by plane, but had trouble because she was exhausted. [50–51] Finally, Plaintiff told the ALJ that she was taking a

religious studies class for one hours and fifteen minutes per week, but could not do "Mondays at 5:00" because it was too late for her. [AR 51]

I find that substantial evidence does not support a legitimate reason for discounting Dr. Ehlers' opinion. The ALJ stated that Dr. Ehlers opinions were not supported by the evidence, including his own treatment notes, but that is not the case. The ALJ does not provide reasoning why he discards Dr. Ehlers' opinion that Plaintiff would need to be off-task 25% or more of the workday, that she would need to have hourly breaks of 15 minutes each, and that she was incapable of even "low stress" work. The fact that Plaintiff was attempting to exercise, at times extensively and at other times less so, does not mean conclusively that Dr. Ehlers' opinions on the above issues should be summarily disregarded without explanation.

This is not akin to *Simmons v. Colvin*, where the court found the ALJ provided sufficient reasoning for discounting a treating physician's controlling weight because the physician's "impairment ratings on the forms were far more extreme than his own treatment notes would suggest." 635 F. App'x 512, 515 (10th Cir. 2015) (unpublished). For example, the treating physician's opinion in *Simmons* that the plaintiff "could never rotate his neck to the left or right is contradicted by notes that reflect a fairly normal range of motion" and he suggested that the plaintiff "might want to consider different work" given the heavy physical demands of his job, but then later cleared the plaintiff to work as a commercial driver. *Id.* at 515–16, n.4.

Those sort of inherent contradictions do not exist in the case at hand. If the

ALJ was to not give controlling weight to Dr. Ehlers' opinion, he must give legitimate reasons for doing so. The ALJ must also reevaluate if the medical records as a whole support Dr. Ehler's opinion that Plaintiff would need to be off-task 25% or more of the workday, that she would need to have hourly breaks of 15 minutes each, and that she was incapable of even "low stress" work.

### 2. Ms. Evans' Opinion

Plaintiff argues that the ALJ's "complete rejection" of Ms. Evans' opinions was reversible error because it violated SSR 06-03p, 2006 WL 2329939 (Aug 9, 2006) ("SSR 06-03p"). ECF No. 16 at 24. Plaintiff claims alternatively that: (1) Ms. Evans' opinions are deserving of controlling weight even though she is not an acceptable medical source; or (2) they should merely outweigh an opinion of an acceptable medical source if Ms. Evans' opinions are better supported. ECF Nos. 16 at 23–24 and 20 at 7. She reasons that the ALJ did not correctly follow SSR 06-03p because he found summarily that Ms. Evans' opinions were not adequately supported by "objective clinical findings and other evidence." ECF No. 16 at 24.

Defendant argues that only treating sources' opinions may be given controlling weight. ECF No. 17 at 16. Defendant continues that if Plaintiff is arguing the ALJ should have given merely greater weight to Ms. Evans, that it was sufficient for the ALJ to find that her opinions were "not supported by objective clinical findings and [were] otherwise inconsistent with the medical and other evidence of record and [gave] specific examples in support of that finding." *Id.*

As a therapist, Ms. Evans is considered an "other source," specifically a

nonmedical source. SSR 06-03p, at *2. An ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. Only medical opinions that are considered treating sources may be given controlling weight. 20 C.F.R. § 404.1527(a), (c)(2). However, "[d]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a . . . nonmedical source may outweigh the medical opinion of an acceptable medical source . . . ." *Id.* at § 404.1527(f)(1). Essentially, this argument hinges upon whether a subsequent reviewer could follow the ALJ's reasoning about the weight given to Ms. Evans, and as such I must review her treatment notes and other related findings in the record.

Ms. Evans first saw Plaintiff in April 2016. [AR 621] Ms. Evans found that Plaintiff "had a complicated adjustment to life with cancer and now is having a mal-adaptive adjustment to life post cancer. Client's anxiety and depressive symptoms are keeping her from living the life she wants to live socially, physically, and spiritually." [*Id.*] Plaintiff generally showed improvement over the next few sessions, but in June 2016 Plaintiff stated she was trying to establish a "new normal" and that she was "fatigued all the time." [AR 624–26] Plaintiff reported "extreme fatigue" that led her to feeling lonely. [AR 627] Plaintiff was concerned about not having the energy to spend time with visiting family or "[do] much for

16

very long." [*Id.*] The progress notes in July and August showed Plaintiff consistently tired and fatigued with the final treatment note merely reading that Plaintiff was "feeling weak and sick today. She had a hard time getting out of the house." [AR 628–31]

On September 29, 2016 Ms. Evans completed a mental impairment questionnaire. [AR 613–18] Ms. Evans observed Plaintiff "as having anxiety resistant to treatment. She experiences panic attacks, spontaneous bouts of crying, hopelessness, sadness, and difficulties with sustaining good stamina." [AR 613] As a prognosis, Ms. Evans wrote that Plaintiff "may be able to manage further decline but it unlikely to be in a normal level of functioning either occupationally or personally." [*Id.*] Ms. Evans checked boxes noting that Plaintiff would be at least seriously limited in a variety of mental abilities and aptitudes needed to do skilled, semiskilled, and unskilled work. [AR 615–16] Ms. Evans justified this by pointing to both Plaintiff's reports and Ms. Evans' personal observations and interactions with Plaintiff in therapy. [*Id.*] Ms. Evans checked a box indicating that Plaintiff would likely be absent from work more than four days per month. [AR 618]

There are other findings in the record concerning Plaintiff's mental state. In June 2014, Dr. Ehlers noted that Plaintiff was prescribed medication and briefed on potential depression symptoms. [AR 359] Through June of 2015, Dr. Ehlers does not note serious mental concerns, although Plaintiff was prescribed Lorazepam for anxiety. [AR 346–379, 440–45] In his medical source statement, Dr. Ehlers noted that Plaintiff had depression and anxiety, but wrote in that both were adequately

treated. [AR 436] In a June 2016 appointment, Plaintiff was noted to be tearful discussing her sister's illness, but in August 2016 Dr. Ehlers noted that Plaintiff was stable on her depression medication and was "generally upbeat." [AR 550]

Finally, in April 2016 appointment, Plaintiff's endocrinologist noted that she was "agitated anxious and tearful." [AR 605]

In the ALJ's decision, he reasoned that Dr. Ehlers mental status testing showed "fairly normal mental examination[s] based on situation stressors such as the cancer diagnosis of her sister." [AR 24] The ALJ continued that Plaintiff "was noted to be active socially by attending fitness classes, hosting a party, and spending time with her son celebrating his graduation. The undersigned further notes Ms. Evans's treating history with the claimant was also recent in nature and based in part on the claimant's subjective report of symptoms and not a longitudinal medical history." [*Id.*]

While the ALJ's reasoning concerning Dr. Ehlers' notes appears valid, his further reasoning does not. For example, where Ms. Evans noted that Plaintiff "went to a wedding on Saturday [and] reports working out on Mondays" she further wrote that Plaintiff reported "she was still unavailable to her friends and conserves her energy for the activities she needs to survive." [AR 626] Concerning when Plaintiff spent time with her son celebrating his graduation, the progress note read her "son will be visiting this coming week and she is concerned because she is unsure if she will have the energy to host a party she agreed to have at her house. She is afraid that she will be too weak or sick to enjoy having the family come over."

[AR 627] As discussed *supra* regarding Dr. Ehlers, Plaintiff's attempt at exercise was noted to be a struggle at times and the ALJ does not explain why this would *per se* discount the weight given to certain opinions.

Finally, Ms. Evans noted in her mental impairment questionnaire that her opinions were formulated by Plaintiff's reports and Ms. Evans' personal observations and interactions with Plaintiff in therapy. [AR 615–16] The ALJ discussed Plaintiff's exhaustion regarding some of the events, but failed to sufficiently justify how those claims of exhaustion invalidate Ms. Evans' opinions.

As such, I could not sufficiently follow the ALJ's reasoning and substantial evidence did not justify the ALJ's weight given to Ms. Evans' opinions. The ALJ must reevaluate the weight given to Ms. Evans' opinions following the factors referenced in SSR 06-03p.

### 3. Dr. Frommelt's Opinion

Plaintiff argues that substantial evidence did not support the ALJ's decision to give "great weight" to the opinion of Dr. Frommelt—the state agency examiner concerning mental health. ECF No. 16 at 23. Plaintiff explains that Dr. Frommelt reviewed an incomplete treatment record because none of the records of Ms. Evans were included in Dr. Frommelt's review (Plaintiff began to see Ms. Evans after Dr. Frommelt's review). *Id.* Since these records were not reviewed by Dr. Frommelt, Plaintiff argues that Dr. Frommelt's opinion necessarily could not be based on substantial evidence, and thus neither could the ALJ's decision to give Dr. Frommelt's opinions great weight. *Id.* Plaintiff argues that the un-reviewed records

establish that Plaintiff "had observable signs including appearing underweight, appearing to be sick, tired, [and] emotionally worn out." *Id.*

Defendant summarily responds to this by arguing that an ALJ may rely upon opinions of non-treating examiners if the ALJ explains the weight given to the opinion along with sufficient explanation for the weight. ECF No. 17 at 15.

The ALJ explained that

> [a]lthough Dr. Frommelt was a non-examining medical consultant, and therefore her opinions do not as a general matter deserve as much weight as those of examining and treating physicians, her opinions do deserve great weight, particularly in a case like this in which there exists a number of other reasons, such as the lack of any significant longitudinal treatment history of mental impairments, to reach a similar conclusion.

[AR 23]

Plaintiff does not cite law regarding whether a non-treating consultant's opinion on mental health may constitute substantial evidence if the consultant does not review mental health records. However, as explained *supra*, I am remanding this case in part for the ALJ to reevaluate Ms. Evans' opinions. As such, the ALJ should similarly reevaluate Dr. Frommelt's opinion because a change in the weight of Ms. Evans' opinions would affect the reasoning the ALJ used to assign weight to Dr. Frommelt's opinions. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion").

## C. The ALJ's weighing of Plaintiff's mental health impairments when formulating his RFC

Plaintiff argues that the ALJ did not include certain mental impairments

into his formulation of Plaintiff's RFC. ECF No. 16 at 25–27. Plaintiff states that the ALJ gave Dr. Frommelt's opinion great weight and that Dr. Frommelt opined that Plaintiff would have mild difficulties with concentration, persistence, or pace. *Id.* at 25–26. Plaintiff reasons that the ALJ did not include these difficulties in Plaintiff's RFC and if he did, it would affect the level of skilled work Plaintiff could potentially perform. *Id.* at 26. Plaintiff requests a remand to include these limitations into her RFC "and an assessment of how they affect her ability to concentrate, persist, and maintain pace in a highly skilled job." *Id.* at 27.

Defendant counters by arguing that the ALJ followed proper procedure by finding that Plaintiff's mental impairments were not severe, further evaluated the evidence, and eventually found that Plaintiff should not have an RFC limiting her to unskilled work. ECF No. 17 at 17. Further, Defendant argues that a finding of mild limitation in concentration, persistence or pace does not necessarily lead to a functional limitation in an RFC. *Id.* at 19.

The ALJ determines a claimant's mental impairments using a "special technique" regulated by 20 C.F.R. § 404.1520a. During step two of the five-step analysis, the special technique is used to determine whether a mental impairment is "severe" or "not severe." *Id.* at § 404.1520(d). Even if a mental impairment is not considered severe, the ALJ must further discuss the impairments when formulating the RFC in step four. *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing SSR 96-8p at *4). "Finally, and most importantly, the ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each

conclusion, citing specific medical facts and nonmedical evidence." *Id.* (quoting SSR 96-8p at *7) (alterations and quotations omitted).

Here, the reasoning the ALJ used in determining Plaintiff's RFC was based on his evaluation, in part, of Ms. Evans' and Dr. Frommelt's opinions. [AR 23–24] Since I have remanded this case for a reevaluation of those opinions, the ALJ must also reevaluate whether Plaintiff should be limited to unskilled work.

### D. The ALJ's determination of Plaintiff's credibility

Plaintiff argues that the ALJ did not follow applicable SSA guidelines regarding Plaintiff's subjective statements. ECF No. 16 at 27. Namely, Plaintiff argues that the ALJ was flawed in his reliance on a perceived discrepancy between Plaintiff's statements concerning her conditions compared to her exercise regimen. *Id.* at 27–28. Plaintiff points to the ALJ's reliance on other activities, including travel, family events, and work as a caretaker to argue that the ALJ improperly finds inconsistency with her actions and statements. *Id.* at 28.

Credibility determinations are particularly suited to the finder of fact and must be supported by substantial evidence. *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010). The ALJ must consider a variety of factors in determining credibility, including: "claimant's daily activities; attempts to find relief; the type, effectiveness and side effects of medication; and factors that precipitate and aggravate the symptoms." *Watts v. Berryhill*, 705 F. App'x 759, 763 (10th Cir. 2017) (unpublished) (citing *Hamlin v. Barnhart*, 365 F.3d at 1220).

"An ALJ must do more than merely recite the relevant factors, but must give reasons for the findings linked to the evidence." *Id.* The findings must be closely

linked to substantial evidence, but it is not required that the ALJ perform a factor-by-factor recitation of the evidence. *Id.* (citing cases).

Here, the ALJ spent considerable time writing on Plaintiff's subjective statements. [AR 19–22] Ultimately, he found that Plaintiff's "reported activities could not be performed if [Plaintiff's] physical limitations were as significant as she alleged and that the discrepancies in [Plaintiff's] testimony and the evidence of record diminish the persuasiveness of [her] subjective complaints and alleged limitations." [AR 22]

Since I have remanded for the ALJ to reconsider the weight given to certain opinions, how Plaintiff's subjective comments align with objective evidence in the record may change. *See* SSR 16-3p, 2016 WL 1119029, at *6 (Mar. 16, 2016) ("[SSA] will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and [] will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). Thus, the ALJ must reevaluate how he weighed Plaintiff's subjective comments.

The mere fact that Plaintiff was attempting to exercise should not *ipso facto* justify an inconsistency between Plaintiff's issues with fatigue and her act of exercise. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.") (citing cases).

### E. The ALJ's rejection of a statement from a third-party witness

Plaintiff disputes the reasoning used by the ALJ to assign "some weight" to the statement of Plaintiff's neighbor Catherine S. Hubka. ECF No. 16 at 29–30.

Plaintiff explains that the ALJ violated SSA regulations in his reasoning for assigning "some weight" on the fact that Ms. Hubka lacked medical training. *Id*. Plaintiff also argues that there was no evidence to support the ALJ's finding that Ms. Hubka was "discolored by affection." *Id*.

Defendant argues that the ALJ provided sufficient reasoning and even if he had not discussed Ms. Hubka's opinion there would no error because her opinion would not have substantially affected the outcome of the case. ECF No. 17 at 22, n.4.

Ms. Hubka is considered an "other non-medical source" whose opinion is analyzed under SSR 06-03p, discussed *supra* concerning Ms. Evans. An ALJ need not expressly mention SSR 06–03p, nor the factors articulated therein and must merely "consider" an opinion from an "other source." *Conger v. Astrue*, 453 F. App'x 821, 825 (10th Cir. 2011) (unpublished) (citing *Doyal v. Barnhart*, 331 F.3d at 764); *see Carr v. Comm'r, SSA*, No. 17-7077, 2018 WL 2410879, at *3 (10th Cir. May 29, 2018) (holding that the ALJ was not obligated to weigh statements that "were not '*opinions* concerning [claimant's] symptoms, diagnosis and prognosis, what she can still do despite the impairments, or her physical and mental restrictions.'" (alteration in original)).

In this case, the ALJ did not explicitly invoke SSR 06-03p, but he did mention that he "considered reports regarding the claimant's functionality provided by third-party sources." [AR 24] Under SSR 06-03p, there are a variety of factors to evaluate opinions from "other sources." SSR 06-03p, at *4–5. The final of these is a catchall

provision reading that the evaluation may be based on "any other factors that tend to support or detract from the opinion." *Id.* at 5.

The first reason the ALJ's gave in support of his assigned weight to Ms. Hubka's opinion is that she was not medically trained and thus her conclusions would be questionable "as to dates, frequencies, types, and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms." [AR 24] However, Ms. Hubka is *per se* not medically-trained, as she is considered an "other non-medical source." Without the ALJ noting, even generally, which part of Ms. Hubka's opinion contained a medical observation, I cannot know if it is sufficiently justified.

Next, the ALJ stated that "by virtue of the relationship with the claimant," Ms. Hubka "cannot be considered a disinterested third party witness." [AR 24] Finally, the ALJ posited that the statements did "not evidence greater limitations that [*sic*] those already indicated." [*Id.*] These two reasons provided a connection between the ALJ's reasoning and the applicable regulations as they showed that the ALJ considered the opinion.

As such, the ALJ's reasoning regarding Ms. Hubka's statement complies with the applicable regulations and laws.

## V.    Conclusion

For the above reasons, SSA's decision is REVERSED, and this case is REMANDED for proceedings consistent with this opinion.

The ALJ must reformulate Plaintiff's RFC by: (1) reconsidering whether to

give controlling weight to Dr. Ehlers' opinion and reevaluating if the medical records as a whole support Dr. Ehler's opinion that Plaintiff would need to be off-task 25% or more of the workday, that she would need to have hourly breaks of 15 minutes each, and that she was incapable of even "low stress" work; (2) reevaluate the weight given to Ms. Evans' opinions following the factors presented in SSR 06-03p; and (3) reevaluate Dr. Frommelt's opinions. The ALJ must also reevaluate whether Plaintiff should be limited to unskilled work. Finally, the ALJ must reweigh Plaintiff's credibility pursuant to this Order.

Dated: August 22, 2018, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE